UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>v. )<br>)<br>NATHAN CARMAN, )<br>    Defendant. ) | Docket No. 5:22-CR-49 |

**MOTION FOR DETENTION**

The United States of America, by and through its attorney, Nikolas P. Kerest, United States Attorney for the District of Vermont, moves for the pretrial detention of the defendant, Nathan Carman ("Carman"), pursuant to 18 U.S.C. § 3142(e) and (f). For the reasons set forth below, the government urges that Carman poses a risk of flight; that Carman poses a danger to the community; and that there are no conditions of release which will mitigate either concern. Accordingly, the Court should order Carman's detention pending trial.

BACKGROUND

On May 2, 2022, a federal grand jury sitting in Rutland, Vermont, returned a sealed indictment (the "Indictment") charging Carman with three counts of mail fraud, in violation of 18 U.S.C. § 1341; four counts of wire fraud, in violation of 18 U.S.C. § 1343; and murder on the high seas, in violation of 18 U.S.C. § 1111. The Indictment alleges, among other things, a scheme by Carman in which he sought to defraud the estate of his grandfather, John Chakalos, its executor, the Chakalos Family Dynasty Trust, and its trustees. The Indictment further alleges that as a central part of this scheme, Carman murdered both his grandfather and his mother, Linda Carman. As part of the scheme, Carman concocted cover stories to conceal his involvement in those killings. During the cover-up, Carman misrepresented his involvement in and responsibility for those deaths to law enforcement, to his family, to those who made

1

inquiries about the deaths and their circumstances, and to others who challenged his cover-up or challenged his rights to his grandfather's assets.

## ARGUMENT

I.     Applicable Law

Under the Bail Reform Act, 18 U.S.C. §§ 3141 et seq., federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight. 18 U.S.C. § 3142(e). A finding of risk of flight must be supported by a preponderance of the evidence. *See*, *e.g.*, *United States v. Patriarca*, 948 F.2d 789, 793 (1st Cir. 1991); *United States v. Jackson*, 823 F.2d 4, 5 (2d Cir. 1987); *United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985). A finding of dangerousness must be supported by clear and convincing evidence. *See*, *e.g.*, *United States v. Ferranti*, 66 F.3d 540, 542 (2d Cir. 1995); *Patriarca*, 948 F.2d at 792; *Chimurenga*, 760 F.2d at 405.

The Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the defendant, including the person's "character . . . [and] financial resources"; and (4) the seriousness of the danger posed by the defendant's release. *See* 18 U.S.C. § 3142(g). Evidentiary rules do not apply at detention hearings and the government is entitled to present evidence by way of proffer, among other means. *See* 18 U.S.C. § 3142(f)(2); *see also United States v. LaFontaine*, 210 F.3d 125, 130-31 (2d Cir. 2000) (government entitled to proceed by proffer in detention hearings). Where a judicial officer concludes after a hearing that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial." 18 U.S.C. § 3142(e)(1).

II.     Eligibility for Detention

Carman is eligible for detention because the case involves a crime of violence for which a maximum term of imprisonment of ten years or more is prescribed, *see* 18 U.S.C. § 3142(f)(1)(A); an offense for which the maximum sentence is life imprisonment or death, *see* 18 U.S.C. § 3142(f)(1)(B); a serious risk that the defendant will flee, *see* 18 U.S.C. § 3142(f)(2)(A); and a serious risk that the defendant will obstruct or attempt to obstruct justice, or threaten, injure, or initimdate, or attempt to threaten, injure, or intimidate, a prospective witness or juror, *see* 18 U.S.C. § 3142(f)(2)(B).

III.    Carman Poses a Risk of Flight

Count Seven of the Indictment charges Carman with murder on the high seas, in violation of 18 U.S.C. § 1111.  This offense carries a mandatory penalty of life imprisonment.  Even if convicted of fraud alone, the sentencing guidelines advise a life sentence.  The possibility of a substantial sentence is a significant factor in assessing the risk of flight.  *See United States v. Moscaritolo*, No. 10 Cr. 4 (JL), 2010 WL 309679, at *2 (D.N.H. Jan. 26, 2010) ("[T]he steeper the potential sentence, the more probable the flight risk is, especially considering the strong case of the government . . . .") (*quoting United States v. Alindato–Perez*, 627 F. Supp. 2d 58, 66 (D.P.R. 2009)).  The very real prospect of Carman spending the rest of his life in prison provides him with a compelling incentive to flee.

Moreover, Carman's offense involved detailed planning over the course of many years, as well as deceit, deception and subterfuge.  During his time at sea, he evaded detection by aerial reconnisance teams.  Carman is believed to possess a United States passport and has traveled outside the United States.  His history includes an incident during his teens in which he fled his family home in Connecticut and was eventually found in Virginia.  During a search conducted

yesterday at Carman's residence, federal agents discovered over $10,000 in cash. This currency could easily fund Carman's flight.

Notwithstanding his residence in Vermont since 2014, Carman does not appear to have any meaningful community ties. He has limited human connections and little personal interaction with other people. His conduct severed his ties with his remaining family. He lives alone, has no children or significant other, and has been unemployed for years. Additionally, Carman was treated for mental health issues from the time he was a small child until he was seventeen years old. Since that time, Carman has avoided any mental health treatment. Collectively, these factors create a powerful incentive for Carman to flee, which can only be mitigated by his pre-trial detention.

Notably, even home confinement with electronic monitoring would be inadequate to mitigate the risk that Carman would flee because he could easily remove a monitoring device. At best, home confinement with electronic monitoring would merely reduce Carman's head start should he decide to flee. *See United States v. Zarger*, 2000 WL 1134364, at *1, (rejecting defendant's application for bail in part because home detention with electronic monitoring "at best . . . limits a fleeing defendant's head start"); *United States v. Benatar*, 2002 WL 31410262, at *3 (E.D.N.Y. Oct. 10, 2002) (same); *see also United States v. Casteneda*, 2018 WL 888744, at *9 (N.D. Cal. Feb. 2018) (same); *United States v. Anderson*, 384 F. Supp. 2d 32, 41 (D.D.C. 2005) (same).

IV.    Carman Poses a Danger to the Community

The "nature and circumstances" of Carman's offenses weigh heavily in favor of detention. Carman's alleged conduct clearly illustrates danger to the community: the evidence shows that he has killed not once, but twice. Moreover, the individuals Carman killed were his

own family members. For an individual who would kill his own family members, nothing is off the table. Carman has a history of involvement with firearms, including the Sig Sauer rifle he purchased in New Hampshire and used to kill his grandfather in Connecticut.

Carman is alleged to have killed for money and there is no reason to believe he would not also kill to gain advantage in a criminal case, particularly to avoid the possibility of life imprisonment. To be sure, the killings alleged in the scheme took place in the past. Carman killed strategically to achieve his goals. But Carman's motives have changed with the charges. Before yesterday, Carman was working diligently to successfully execute his scheme, which turned on false representations about his involvement in the killings. After the unsealing of the Indictment, Carman's focus will become avoiding a lifetime in jail. These facts suggest that Carman could retaliate against a witness. As a result, were Carman to be released, witnesses would be at risk. Carman's history and characteristics include the obvious fact that, in addition to having little or no human connections, he has little or no empathy for others.

Carman's mental instability, which has gone untreated for the past decade, provides further reason to believe that he poses a danger. Available mental health records provide persuasive evidence to support dangerousness concerns. Carman was first treated by mental health professionals at the age of five. He was medicated from the time he was seven until approximately age seventeen. Records indicate that medication was, in part, intended to help manage anger. At the age of nine, evaluators expressed concern about Carman's "social difficulties" and "explosive rages," highlighting episodes "in which he can become aggressive." Records from a 2003 evaluation describe Carman as follows: "He exhibits a highly unconventional problem solving style that is often not the most socially appropriate means of resolving the problem in a satisfactory manner. He tends not to consider others in his problem

solving strategy, but appears to rely on immediate need gratification. That is, his self-interests almost always override the interest of others regardless of the outcome." During this period, Carman was tentatively diagnosed as suffering from a Pervasive Developmental Disorder.

In April of 2011, Carman was brought into a facility for an emergency evaluation after a tumultous incident at his school. Carman was diagnosed with potential mood and psychotic disorders. Doctors noted that Carman had a history of hostility and aggression, and cautioned about the possible emergence of schizophrenia in the future. Doctors identified signs of catatonia emerging and noted that Carman's insight into his deterioration was limited. Thereafter, Carman began refusing medication and treatment. In 2014, police in Middletown, Connecticut secured a "risk warrant" resulting in Carman being evaluated at a local hospital. Carman denied that he needed any form of psychiatric observation or care and he appears not to have received any form a mental health treatment in subsequent years. Indeed, this history raises a serious risk that should Carman conclude that he might be convicted he would lash out at others and engage in self harm, a tragedy not uncommon in today's culture.

Carman's untreated mental illness bars a refutation of this dangerousness conclusion because the Court cannot appreciate Carman's current mental health diagnosis. To the extent that Carman attempts to counter the evidence of dangerousness, the Court should not hear those claims without a proper mental health diagnosis detailing how that diagnosis impacts Carman's dangerousness. In order to have a proper diagnosis, the Court should detain Carman and order that he undergo a detailed mental health evaluation through the United States Bureau of Prisons.

Finally, the facts set forth in the Indictment suggest that there will be compelling evidence of guilt at any trial in this case, which weighs heavily in favor of detention. Supervision on conditions could not "assure" the safety of the community because Carman's

unwillingness to engage in treatment, coupled with his deceptive behavior, would negate the utility of supervision.

V.     Time for Detention Hearing

The government requests that the Court conduct the detention hearing after a continuance of three days. *See* 18 U.S.C. § 3142(f)(2). The additional time is necessary to allow for the United States Pretrial Services Office to complete its report and for the government to process and review evidence seized during the execution of a search warrant which may be material to the question of detention.

## CONCLUSION

For the reasons set forth above, the government ask the court to order Carman detained pending trial.

Dated at Burlington, in the District of Vermont, May 11, 2022.

Respectfully submitted,

NIKOLAS P. KEREST
United States Attorney

By:   */s/ Nathanael T. Burris*
Nathanael T. Burris
Paul J. Van de Graaf
Assistant U.S. Attorneys
P.O. Box 570
Burlington, VT 05402-0570
(802) 951-6725
nate.burris@usdoj.gov