UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No. 5:22-cr-49-gwc |
| | ) | |
| NATHAN CARMAN, | ) | |
| Defendant. | ) | |

### MOTION FOR PRE-TRIAL RELEASE ON CONDITIONS

NOW COMES Defendant Nathan Carman, through counsel, and respectfully moves this Honorable Court to vacate the Order of Detention, and order that Mr. Carman be released on conditions pending trial in this matter. This motion is being filed pursuant to 18 U.S.C. § 3142 based on information that has a material bearing on the issue of whether there are conditions of release that will reasonably assure the appearance of Mr. Carman as required and the safety of the community.

### I.   Procedural Summary

On May 2, 2022, an indictment was filed against Mr. Carman charging him with three counts of mail fraud in violation of 18 U.S.C. § 1341, four counts of wire fraud in violation of 18 U.S.C. § 1343 (where the alleged fraud includes the murder of his grandfather, John Chakalos) and one count of murder (of his mother, Linda Carman) on the high seas (Count 7), in violation of 18 U.S.C. § 1111. He was arrested on May 10, 2022 and arraigned on May 11, 2022. Also on May 11th, the United States, through its counsel, filed a motion for pretrial detention of Mr. Carman pursuant to 18 U.S.C. § 3142(e) and (f), citing certain allegations of fact in support of the indictment and Mr. Carman's detention. The Court set a detention hearing for May 16, 2022.

Mr. Carman, through counsel, requested a continuance to pursue additional investigation prior to a detention hearing on this matter. In the meantime, Mr. Carman has remained

incarcerated for the longest period of his life, and indeed, for the first time in his life. At a status

on May 27, 2022, the Court inquired of the parties whether there were any concerns regarding

competency issues in this case. Defense counsel noted that it had absolutely no concerns about

the competency of Mr. Carman, and despite the strong allegations in its detention motion, the

Government conceded that it had no basis to request such an exam. Now, Mr. Carman requests

that after over 53 days of incarceration, he be released on conditions, pending trial.

## II.    Applicable Law

In its Motion for Detention, the United States argues: 1) Mr. Carman poses a risk of

flight; and 2) Mr. Carman is danger to the community. *See* Gov. Motion for Detention, ECF No.

8. The United States further asserts that "there are no conditions of release which will mitigate

either concern." *Id.* at 1.

Under the Bail Reform Act, Congress instructed courts that the decision to release a

defendant pre-trial turns primarily on the factors enumerated in 18 U.S.C. § 3142(g), including

"the nature and circumstances of the offense charged" *id.* § 3142(g)(1); "the weight of the

evidence against the person" *id.* § 3142(g)(2); and "the history and characteristics of the person"

id. § 3142(g)(3). After considering the application of the factors, the judge "shall order" the

defendant's pretrial release unless the judge determines that the defendant presents an

unreasonable risk of flight or a danger to any other person or the community. *See* 18 U.S.C. §

3142. In applying the factors to any particular case, the Court should bear in mind that it is only a

"limited group of offenders" who should be denied bail pending trial. *United States v. Shakur,*

817 F.2d 189, 194–95 (2d Cir. 1987).

Assessing risk of flight requires a two-step inquiry. *Shakur,* 817 F.2d 189, 194–95 (2d

Cir. 1987). First, the Court must make a finding as to whether a defendant presents a risk of

2

flight if not detained. *Id.* Second, if the Court finds that a defendant is likely to flee, then it must proceed to consider whether there are conditions or a combination of conditions which reasonably will assure the presence of the defendant at trial if he is released. *Id.* Detention based on risk of flight must be supported by a preponderance of the evidence. 18 U.S.C. § 3142(e).

As to public safety concerns, the Court may only deny a defendant's pre-trial release if the government meets its burden to prove by clear and convincing evidence that defendant poses a danger to "the safety of any other person and the community." 18 U.S.C. § 3142(e)(f). Dangerousness includes "a serious risk that the [defendant] will…attempt to obstruct justice, or threaten, injure, or intimidate… a prospective witness or juror." 18 U.S.C. § 3142(f)(2)(B). Detention based on dangerousness must "be supported by clear and convincing evidence" of dangerousness. 18 U.S.C. § 3142(f). Because the government fails to meet its burden on both of these grounds for detention, Mr. Carman must be released on conditions pending trial.

Any release on bail is subject to the condition that the defendant not commit any crimes during the release period. *See* 18 U.S.C. § 3142(c)(1)(A). Beyond this, the Court must impose the least restrictive set of conditions necessary to secure the defendant's presence and the safety of others, but it also has broad discretion to impose almost any "reasonably necessary" bail condition.[1] 18 U.S.C. § 3142(c)(1)(B). Mr. Carman proposes a set of conditions that will address both below.

---

[1] In its motion for detention, *see* ECF No. 8 at 6,  the government argues that as to the issue of public safety, the Court should order a "detailed mental health evaluation" prior to considering the release of Mr. Carman. The Second Circuit in *United States v. Martin-Trigona*, 767 F.2d 35, 36 (2d Cir. 1985) found that there is no authority in the Bail Reform Act to require, prior to release, a psychiatric examination of a defendant on the issue of dangerousness. The Court cannot, and should not, grant such a request.

3

### III.     The History and Characteristics of Mr. Carman Support his Pretrial Release

#### a.   *Mr. Carman's Family History in Connecticut*

Mr. Carman grew up in Connecticut. His parents divorced when he was about four years old and thereafter he primarily resided with his mother, Linda Carman. His maternal grandparents also lived nearby and he was particularly close with his grandfather, John Chakalos. Growing up, Nathan enjoyed being outdoors, fishing, boating, and animals. In part due to his Asperger's diagnosis, as well as his inherently introverted personality, he was bullied relentlessly and viciously in school. He had few, if any, friends.

He shied away from team sports but was an avid equestrian. The owner of the stable he used to ride at recalls how Nathan started riding when he was about six years old. *See* Exhibit A, Letter from Renee Scarpantonio. Ms. Scarpantonio thought of Nathan and Linda as friends and was also familiar with Mr. Chakalos as he took care of all the financial expenses. She notes, "As a child and a young teenager – I never witnessed or heard that Nathan had any outbursts or aggressive behaviors. He mostly kept to himself and was always at the barn with his mother and occasionally his father." *See id.*

Beyond the financial supports Mr. Carman's grandfather provided his young grandson, they also had a very close and special relationship. *See* Exhibit A, Letter from Renee Scarpantonio. Mr. Chakalos mentored Mr. Carman and had hopes that one day, he would work with him in the family business. A family friend familiar with Nathan, Linda, and John recalls the "bond" between Mr. Chakalos and Mr. Carman, and the "warmth" he witnessed Mr. Carman had for his grandfather. He recounts the fond memories he had of spending time with the Carman and Chakalos family in Vermont. *See* Exhibit B, Letter from Richard Sabato.

4

Upon receiving his high school diploma, Mr. Carman moved out of his mother's home through the help and support of his grandfather. Soon after, he got an apartment at a high-end apartment complex close to his grandfather, paid for by his grandfather. He had a one-bedroom apartment but when he wanted a larger space, his grandfather was eager to provide this for him. His grandfather also bought him a truck and provided him with a credit card that had a five-thousand-dollar limit that was paid off each month, although Mr. Carman rarely, if ever, spent the amounts his grandfather would have allowed. Mr. Carman started to attend business meetings with Mr. Chakalos including with architects and project managers, which he took a particular interest in. His grandfather spoke of putting Nathan in charge of several upcoming projects and of, one day, handing the company over to him. He was incredibly close to his grandfather, especially during this time. He had dinner with him nearly every night. He also assisted his grandfather, who was hard of hearing, with reviewing his business' voicemail messages each evening.

Mr. Carman also had plans, that his grandfather supported and intended to support financially, to start at Keene State College in January 2014. But then, on December 20, 2013. his grandfather was tragically shot and killed. That event changed things significantly for Mr. Carman – and not for the better as the government has suggested. He went from having a close relationship and full and complete support, both financial and emotional, from his grandfather, as well as housing and a fast track to a job at his grandfather's company, to none of those things. He called off his plans to go away to college and enrolled in local community college instead. He moved closer to his mother, his closest remaining family member, in Middletown, Connecticut and stayed in a more affordable apartment for a year.

Also in 2014, in preparation for what Mr. Carman believed was his likely need for legal

5

defense as it became clear investigators were focused on him, he sold his truck and found a more affordable vehicle. He was not spending recklessly, as suggested by the government. When he was told legal charges appeared imminent, only then did he seek money from his trust so that he could defend himself. However, when the police failed to obtain an arrest warrant and failed to move forward with criminal charges against him, Mr. Carman took what money he had and moved to Keene, New Hampshire where he rented a room for about $400 a month. There, he had two jobs, one in the morning working for FedEx in Chesterfield NH. And one in the afternoon as a dishwasher in Dublin, NH, at an exclusive private school.

In October 2014, Mr. Carman bought a house just over the river from New Hampshire in Vernon, Vermont. It was a fixer-upper and he bought it for about $74,000. His plan was to live there, renovate it, and "flip it" to sell for a profit. With his grandfather gone, his plan was to try to get some hands-on experience with building projects as he was still interested in the type of work he had been doing when his grandfather was alive, such as project management and development. During this time, Mr. Carman had a good relationship with his mother. They frequently went on fishing trips together. They even had plans to go on an adventure cruise-type trip to the Galapagos in January of 2017. Unfortunately, due to the tragic death of his mother in September of 2016 after their boat sank while they were on a fishing trip, those plans were not seen to fruition.

### b. *Mental Health History*

After Nathan's parents divorced, Linda Carman had difficulties with him when he was very young – he was colicky, did not sleep well, and was prone to tantrums. She sought professional help when he was five years old regarding possible developmental disabilities. At a young age, Nathan was diagnosed with Asperger Syndrome. As all young children do, Mr.

Carman did have tantrums, including some "outbursts." However, to the extent the government has raised Mr. Carman's juvenile history of "aggression" or "mental instability" as weighing against his release, or to the extent that such characterizations are even accurate, this type of conduct was isolated to his elementary years, as more specifically discussed below.

When he was about seventeen, Nathan's most beloved horse "Cruise" died. This would have been, as Ms. Scarpantonio recognizes in her letter, *see* Exhibit A, a very traumatic event for Mr. Carman, and from her perspective as an equestrian, it would have been entirely normal to have mental anguish afterwards. Between unresolved emotions resulting from the divorce of his parents, the death of his beloved horse, family history of mental health struggles, and an overall difficult and opinionated family, Mr. Carman had a tumultuous year following Cruise's death.

It was in this context that Mr. Carman had a particularly bad day at school, in 2011, where he became so distraught and emotional and he ended up being brought to the hospital. It was eventually determined that his conduct was primarily due to these aforementioned stressors and his Asperger's diagnosis. He was not deemed to need inpatient treatment, nor was he ordered to take any medications.

In July of 2014, it became clear that police were focused on Mr. Carman as a suspect and were looking to arrest him for the murder of his grandfather. As the government is aware, Mr. Carman was thus evaluated more recently than 2011, in July 2014, by the same doctor who evaluated Mr. Carman in 2011. That more recent evaluation did not find any signs of psychosis, schizophrenia, "mental instability," or any other untreated mental health issues. It contained no recommendations for inpatient treatment. He was assessed as being safe for discharge and he was discharged.

  c. *Civil Litigation, Adulthood, and Life in Vermont*

7

Mr. Carman is now twenty-eight years old. For the last eight years, Mr. Carman continued to reside in Vernon, Vermont. Due to the enormous number of renovations it turned out his house required, as well as the excessive time spent he has been required to spend in civil litigation, he did not end up trying to sell the home. Instead, he remained at the home and prior to his arrest, he led a quiet life with solid ties to the community. During his time in Vernon, he participated in town forums, attended the local church, and has forged friendly relationships with many neighbors and members of the local community. *See* Exhibit C, Letter from Pastors Bruce Burks and Derek Irvine. The Pastors note that they have known Mr. Carman for over five years through his attendance at Bible study and church services, as well as socially, and that he has always been pleasant, intelligent, and never threatening.

He has also been accused of murder by his aunts, through various civil proceedings, and been forced to defend himself since about 2017. He has attended many court appearances and depositions through these numerous civil suits. The cases included an insurance case in Rhode Island (*National Liability & Fire Insurance Company, Plaintiff and Intervenor Plaintiffs, Valerie Santilli, et al., v. Carman*, United States District Court for the District of Rhode Island, Case No. 17-038-JJM-PAS; action initiated on Jan. 27, 2017, bench trial completed Sept. 4, 2019, and final order issued Nov. 4, 2019), a probate court case in Connecticut (*Carman v. Santilli*, West Hartford, Connecticut, 2018), and another probate court case (a so-called "slayer petition") in New Hampshire (*Valerie C. Santilli, et al., Petitioners v. Nathan Carman*, 6th Circuit Probate Division, Case No. 313-2017-EQ-00396; petition brought on July 17, 2017 and dismissed by the Court on May 9, 2019). No court has ever found him responsible for the death of his beloved grandfather or his mother. He has no criminal record and there is no evidence that he has any recent history, if any history at all, of violence or mental instability.

8

**IV.    The 18 U.S.C. § 3142(g) Factors Support Mr. Carman's Pretrial Release on Conditions**

Because the United States fails to meet its burdens of proof to establish that Mr. Carman is a risk of flight by a preponderance of the evidence or a danger to the community by the heightened standard of clear and convincing evidence, Mr. Carman must be released pursuant to the factors enumerated in 18 U.S.C. § 3142(g). The government has further failed to show why no condition or combination of conditions of release will reasonably assure Mr. Carman's presence at trial and the safety of others pending trial, such that detention is merited pursuant to 18 U.S.C. § 3142(e). As such, Mr. Carman must be released pending trial in this matter, and any concerns regarding either flight or dangerousness to the community can be easily addressed by the Court through imposition of a combination of conditions of release pursuant to 18 U.S.C. § 3142(c).

*a.  Mr. Carman is Not a Flight Risk*

In its motion for detention, the United States first attempts to justify pretrial detention by claiming that Mr. Carman's case involves a "serious risk that the defendant will flee," despite no attempt by Mr. Carman to do so in the face of nearly twelve years of law enforcement scrutiny since his grandfather's death in 2013. *See* Gov. Motion for Detention, ECF No. 8 at 3. Instead, to support this flight-risk claim, the government points to the serious nature of the charges, and lists various isolated factors that it insists, when taken together, "create a powerful incentive for Carman to flee, which can only be mitigated by pre-trial detention." *Id.* at 4. Many of their points can be easily discounted when confronted by fact, logic, or both.

9

The mere fact that Mr. Carman possesses a passport, $10,000 in cash savings, and "has traveled outside the United States," for example, is unremarkable. Mr. Carman has no foreign ties, has only traveled outside of the United States a handful of times (the last over five years ago). He is willing to surrender his passport to the Court should he be released pending trial. The government's concern that Mr. Carman's very limited cash savings of $10,000 would "easily fund his flight," is also unfounded. Mr. Carman does have $10,000, but he *only* has $10,000 – the equivalent of around two-and-a-half months' pay for the average United States worker. *See* News Release, Bureau of Labor Statistics, U.S. Department of Labor, April 15, 2022 (noting that the "[m]edian weekly earnings of full-time workers were $1,037 in the first quarter of 2022."), available at: https://www.bls.gov/news.release/pdf/wkyeng.pdf (last viewed July 5, 2022). As with his passport, Mr. Carman is also willing to turn that money over to a third party while this case is pending, or to post some amount of it as bail.

Likewise, the government's mention of "an incident during his teens in which he fled his family home in Connecticut and was eventually found in Virginia," appears to suggest that because he ran away once from his parents, he will do so again from this Court. This logic is not sound. At the time he left home in 2011, Mr. Carman was seventeen and a half years of age and had recently been in a disagreement with his parents. This isolated incident of teenage frustration that occurred a decade ago is not relevant to whether Mr. Carman, now a twenty-eight-year-old, will be present for his criminal proceedings as ordered by this Court. As the government is aware, Mr. Carman actually has a significant and documented history of *always* appearing in court as directed, even in relation to a lengthy civil lawsuit filed by Mr. Carman's aunts in New Hampshire which required him to defend the same allegations underlying his current criminal

10

charges here in the District of Vermont. Mr. Carman has never failed to appear for court, and he will not do so in this case.

The government goes on to mention that Mr. Carman "does not appear to have any meaningful community ties," and cites his "limited human connections and little personal interaction with other people," lack of significant other or child, "severed ties with his remaining family," and vague mentions of Mr. Carman avoiding mental health treatment for "mental health issues." To quickly address the government's mention of "severed ties" with remaining family, it is disingenuous to characterize this as a choice Mr. Carman made. A more accurate telling of the facts would be that after his grandfather's death, the majority of his family unfairly accused him of murder, cut ties with him, and launched an extensive lawsuit against him that cost him nearly all of his money to defend against. Furthermore, Mr. Carman does maintain ties with his only remaining nuclear family member: Mr. Nathan's father continues to stay in contact with him despite these allegations and supports his release.

Although it is accurate that Mr. Carman is unmarried and has no children, that does not support the conclusion that he has no meaningful community ties. And available evidence points to the opposite conclusion:  Mr. Carman owns a home in Vernon, Vermont, where he has resided for the past eight years. During that time, he has participated in town forums, attended the local church, and has forged friendly relationships with many neighbors and members of the local community. *See* Exhibit C, Letter from Pastors Burks and Irvine. Furthermore, Mr. Carman's solitary nature and limited personal interactions (to the extent that the government deems the interactions described in Exhibit C as "little" or "limited") can very adequately be explained as typical for an individual with a diagnostic history of Asperger's Syndrome, a type of Autism Spectrum Disorder. *See generally* Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of

11

Mental Disorders § 299.10, 299.80 (4th ed. 1994) [hereinafter DSM-IV] (discussing the diagnostic features of Asperger's Syndrome). A diagnosis of Asperger's does not make someone a flight risk. Mr. Carman's mental health history is addressed in more detail in part "b" of this section, below, but the contention of the United States that Mr. Carman "avoided" mental health treatment over the past ten years is, quite simply put, false. As the government was aware at the time of the writing and filing of their motion for detention, Mr. Carman's last evaluation in 2014 (at the demand of law enforcement in the wake of his grandfather's death, no less) contained no recommendation for inpatient treatment, did not suggest any "mental instability," and Mr. Carman was simply discharged. His only standing diagnosis is Asperger's.

To address the remaining government argument regarding the seriousness of Mr. Carman's charges and the underlying allegations of fact to support Mr. Carman's detention on these grounds, the Defendant will touch on the weaknesses in the evidence supporting the charges in more detail below in section "c." However, it is worth noting that Mr. Carman has been unofficially, but consistently, accused of these same murders for nearly ten years overall. In the face of such very serious accusations, criminal investigations, and civil lawsuits (based on the exact same set of facts underlying the current federal prosecution), Mr. Carman did not flee. Mr. Carman did not attempt to flee. What he *did* do was engage very frequently with the criminal justice and legal systems. He spoke with law enforcement, he spoke with the media, he appeared in court dozens and dozens of times, and he answered every question put to him in the civil cases regarding his alleged involvement in the murder. His conduct over the past ten years clearly demonstrates that he has every motivation to continue fighting these allegations, making him *less* of a flight risk, not more as the government contends.

b. *Mr. Carman is Not a Danger to the Community*

12

The government can likewise not meet its burden to show that Mr. Carman is a danger to the community by clear and convincing evidence. In its motion for detention, the United States appears to rely on two primary points to make its argument: 1) the nature and circumstances of the alleged crimes, and 2) Mr. Carman's "mental instability."[2] Gov. Motion for Detention, ECF No. 8 at 4-7. First, to the extent that the nature and the circumstances of the alleged crimes weigh in favor of the government, the weight of the evidence against Mr. Carman (or rather, lack thereof) and the complete lack of any suggestion of violence, instability, or mental illness for the past ten years significantly undercuts this argument. It is worth reiterating that numerous law enforcement agencies and several other jurisdictions investigated Mr. Carman for the death of his grandfather and his mother – the same evidence for the same charges that *this* United States Attorney's office is now prosecuting – and brought no charges.

Mr. Carman turns first to the nature and circumstances of the alleged crimes. As previously mentioned, Mr. Carman has been under criminal investigation for, and subject to civil suits related to, these same deaths for *almost ten years*. At no time during that lengthy period has Mr. Carman ever attempted to threaten a witness, contact a witness inappropriately or sought to influence a witness in any way. There is no evidence to support such a claim now. To the extent the government points to the "history of involvement with firearms" as a factor, that "history" is incredibly limited, at best, and Mr. Carman does not currently own any firearms, nor does he have access to any.

Mr. Carman next addresses the government's baseless claim that Mr. Carman is a risk to

---

[2] The government's use of the phrase "mental instability" in its motion is inappropriate and unsupported by evidence in Mr. Carman's case. As the government is aware, Mr. Carman's sole diagnosis is Asperger's, a neurodevelopmental disorder, **not** a mental illness.

13

public safety due to his "mental instability" and "untreated mental illness." Quite simply, Mr. Carman is not mentally unstable, nor does he have an untreated mental illness. The government is aware of this, and yet argues to the contrary by citing various unrelated instances of contact with mental health professionals during Mr. Carman's childhood and vaguely asserting that Mr. Carman was "medicated" from age seven until about seventeen. The government's attempts to make this period of time sound sinister, or hint at dangerous diagnoses, falls flat in the face of the truth. As the government knows, Mr. Carman's past periods of medication or treatment in his childhood for common conditions such as ADHD, depression, and anxiety do not make him dangerous.

The government, in their eagerness to incarcerate Mr. Carman for years-old allegations, is grasping at straws. Mr. Carman is now twenty-eight years old. The records the government refers to in their motion are from Mr. Carman's youth – at best, from ten years ago, but most are much older than that. These records have little probative value regarding his current dangerousness or treatment needs. The government offers no evidence that during the past ten years, a time of significant loss and instability in Mr. Carman's personal life, that he has acted aggressively or has suffered from untreated mental illness that would make him dangerous. In fact, the government appears to gloss over the fact that Mr. Carman has actually not needed *any* mental health intervention or treatment for the past ten years. His last evaluation was conducted at the request of law enforcement in 2014 – an attempt, perhaps, to show that he was aggressive or dangerous in the wake of his grandfather's death. That evaluation identified his Asperger's diagnosis, yet no other significant or serious mental health diagnoses, and ordered no treatment.

The government then goes on to highlight numerous inflammatory points taken out of context from an evaluation in 2003, when Mr. Carman was only *nine years old*. *See* Gov. Motion

14

for Detention, ECF No. 8 at 5. At that time, concerns were expressed regarding his "social difficulties," but again, this is a common trait of individuals with Asperger's and has no bearing on dangerousness or public safety, especially almost twenty years later. The "explosive rages" and "episodes" the government next references are also from when Mr. Carman was nine years old and younger. *Id.*

By the age of fourteen, it was clearly noted in a 2008 evaluation that although Mr. Carman had a history of these "episodes," the behaviors had remitted and, "Nathan has no known history of violence, does not frighten others, and has learned to verbalize things instead of act." The conclusion at that time was that he likely had Asperger's; nothing else was indicated or discussed as a possibility. In 2009, records indicate that, "Mrs. Carman noted that Nathan enjoyed fishing and taking care of horses and equestrian activities…She described him as 'bright, compassionate at times and overall a good kid.'"

The government next points to a set of records from 2011, when Mr. Carman was about seventeen years old. Gov. Motion for Detention, ECF No. 8 at 6. As explained above, the death of Mr. Carman's horse "Cruise" in early 2011 was extremely traumatic for a young boy who turned to animals and horseback riding as opposed to people and team sports. In addition, his parent's divorce and his family dynamic in general continued to be a stressor, and his mother was dating a new boyfriend and spending more time away from home.

The stressors in his life culminated in an incident a school shortly after his horse's death where had become inconsolable and began banging on a calculator to express his emotions. Rather than take steps that might help someone with an Asperger's diagnosis, the school staff did the opposite and unnecessarily escalated the situation. Mr. Carman was brought to the ER for an assessment and did stay in the hospital for a week following his admission. Indeed, to highlight

the difficult dynamics in his family, while he was in the hospital, his mother actually assaulted his grandfather and made statements regarding his large amounts of assets and that she wanted her fair share. She was charged criminally after for this assault.

At the end of the week, Asperger's was still the only concrete "diagnosis" remaining. The treating psychiatrist agreed to Mr. Carman's discharge, even knowing his preference was to continue without medications, and inpatient was not recommended. At no point during this time were there any notes regarding an intent to harm himself or others, nor was he violent at any time during his time at the hospital. There is absolutely no evidence since then that Mr. Carman has any ongoing "mental instability" nor that he requires any sort of treatment that he is somehow avoiding. Indeed, as the government is aware, Mr. Carman was evaluated again in 2014 by that same doctor who saw him in 2011. As noted above, the results of that evaluation did not indicate any "mental instability" or diagnosis that required treatment. That evaluation contained no recommendations for any inpatient treatment. He was assessed as being safe for discharge and he was discharged.

Of additional relevance to highlighting Mr. Carman's lack of any history of violence is the testimony of Valerie Santilli, Mr. Carman's aunt and chief accuser, during deposition related to the Rhode Island civil case in 2018. When Mr. Carman's counsel asked Ms. Santilli to list every violent act that he had ever committed, in her answer she lists only a handful of instances, which includes a temper tantrum when he was in elementary school, one time he did a cannon ball into a swimming pool too close to her, and one time when she claims Mr. Carman held a knife up in self-defense when he was afraid that her large dog was about to attack him (although he did not use or come close to using the knife). That Mr. Carman's chief accuser has said that the five most violent things he has ever done includes doing cannonballs into a pool as a small

16

child resulting in water splashing on her and fails to mention any recent alleged acts of violence highlights the complete lack of evidence to support the government's claim of dangerousness.

   *c. The Evidence Against Mr. Carman is Circumstantial and Tenuous, at Best, and the Weight of the Evidence Supports Release*

     The government has charged Mr. Carman with multiple counts of fraud and one count of murder. In their motion for detention, it alleges that Mr. Carman "killed not once, but twice." *See* Gov. Motion for Detention, ECF No. 8 at 4. With little-to-no mention of what the evidence actually is, the government goes on to state, "the facts set forth in the Indictment suggest that there will be compelling evidence of guilt at any trial in this case." *Id.* at 6. The prosecution's argument appears to be that the mere allegation of serious facts being brought ought to, in and of itself, prove that they have "compelling" and strong evidence to support them. Such a standard should not prevail where the standard is clear and convincing evidence. The prosecution has yet to put forward any evidence in connection to its motion for detention in support of their criminal allegations. That said, an examination of what we do know about the allegations reveals the many inherent weaknesses of the government's cases.

   *1. The Murder of John Chakalos*

     First, the government alleges that Mr. Carman killed John Chakalos, Mr. Carman's grandfather, but notably does not charge him for such crime – but rather, charges him for *denying* that he did so in mandatory responses to civil litigation interrogatories on the subject and denials to the Windsor, Connecticut Police Department. *See* Gov. Motion for Detention, ECF No. 8 at 4; Indictment, ECF No. 1.  The government's theory is that Mr. Carman was motivated to kill "for money." The truth paints a very different picture: Mr. Carman was incredibly close with his grandfather and had all he could want, and more, in terms of financial support. They had

17

a very good relationship, as verified by numerous witnesses who attest to the close relationship between the two, and Mr. Chakalos was mentoring Mr. Carman to someday take over the family business. Mr. Chakalos supported his favorite grandson in every way he could while he was alive, and financially Nathan wanted for nothing – he only had to ask his grandfather, and it was provided to him. With the death of Mr. Chakalos, Mr. Carman lost his closest family member, best friend, nearly limitless financial support, and a fast track to an important position in his grandfather's company. Mr. Carman had little to gain, and much more to lose, with his grandfather's death.

And indeed, beyond the government's weak evidence to support a motive to kill his grandfather, the physical evidence that Mr. Carman did so is likewise weak. This case comes before this Court for prosecution only after a slew of law enforcement entities in Connecticut fully and thoroughly investigated the death of Mr. Chakalos, a state warrant for Mr. Carman's arrest was submitted but returned unsigned the next day, and at least one federal grand jury declined to indict him, by numerous police investigators from the Windsor Police Department, the Connecticut State Police Major Crimes Squad (Central District), the Connecticut State Police Forensic Laboratory, the Federal Bureau of Investigation (FBI), and a Forensic Psychologist. Mr. Carman was thoroughly investigated and despite this, on July 17, 2014, when a warrant for his arrest was submitted on the charge of murder to the prosecutor, it was returned unsigned the next day. No arrest was ever made despite substantial media pressure.

Indeed, the current state of the evidence that Mr. Carman murdered his grandfather remains unchanged – that is, extremely weak. The timing of these charges does not appear to correlate with any new evidence, but rather appears to be based on the same set of facts that previous grand juries and courts rejected as insufficient. There are no new witnesses to point to

18

Mr. Carman. There is no DNA evidence connecting Mr. Carman to the murder.[3] There is no

fingerprint evidence connecting Mr. Carman to the murder. Mr. Carman's whereabouts were

accounted for during the time period when the medical examiner believes Mr. Chakalos died.

There were also plenty of other suspects,[4] including other family members with significant

motive for financial gain and with much greater means to kill Mr. Chakalos. Overall, after many

months of investigation by numerous departments, no arrests were ever made.

   2.  *The Death of Linda Carman*

       The government has a similarly weak case against Mr. Carman as to the death of his

mother, Linda Carman. In September of 2016, Mr. Carman went fishing with his mother,

something that they frequently did together. Their boat went down while somewhere off the

coast of Rhode Island. Mr. Carman was found (and rescued) from a life raft about a week later.

His mother was never found. The government claims that Mr. Carman had motive to kill his

mother "for money." Gov. Motion for Detention, ECF No. 8 at 5. He does not. To this day, Mr.

Carman has not received any financial gain from her death, nor has he sought to profit from her

death or to declare her dead.

       In its allegation, the government claims that Mr. Carman intentionally sunk the boat in a

scheme to kill his mother by making alterations to the boat. Indictment, ECF No. 1 at 5.  At least

one Federal District Court in Rhode Island, however, already considered that argument after

hearing evidence in a week-long civil trial regarding the boat insurance claim stemming from

---

[3] Mr. Carman notes that the Windsor Police actually lost exculpatory DNA evidence from the scene of the crime, which could have allowed the actual killer to be identified and prosecuted.

[4] For example, as the government is aware, Mr. Chakalos had visited an adult erotic store prior to his murder. The weekend prior, he had taken a much younger employee to a casino in Connecticut where he engaged in a sexual relationship, likely for money. Mr. Chakalos had also engaged in relations with this same young employee at his house in New Hampshire. This young woman had an arrest record for drug charges. She was deposed in both the New Hampshire and Rhode Island civil litigation, and the police interviewed her multiple times.

this same incident. The findings of fact and conclusions of law issued by the Federal District

Court supported a conclusion that insurance would not cover the loss due to that fact that

"improper repairs" that Mr. Carman made to the boat "at least indirectly caused" the boat to sink,

there was no finding that the boat intentionally or maliciously sunk by Mr. Carman. *See* Findings

of Fact and Conclusions of Law, *National Liability & Fire Insurance Company v. Carman*, at pg.

10, ¶ 26 (a)( Nov. 4, 2019), *attached hereto* as Exhibit D. The government also does not have

evidence to prove manner of Linda Carman's death, where she died, or that she actually is dead.[5]

And although Mr. Carman has faced intense significant legal and media scrutiny related to his

mother's death, no criminal charges were ever brought by any of the previous agencies and

jurisdictions that investigated Mrs. Carman's death.

    d.  *Even if the Court Feels the United States Has Met Either Burden, Any Concerns* **Can** *Be Adequately Addressed Through the Imposition of a Combination of Conditions of Release Pursuant to 18 U.SC. § 3142(c)*

    As set forth above, Mr. Carman's history and characteristics demonstrate that he does not

pose a risk of flight and does not pose a danger to the community. The government will fail to

meet either burden. To the extent that the court does have remaining concerns after a hearing on

the matter, there are sufficient conditions to assure Mr. Carman's appearance at court, including:

pretrial release supervision, curfew, surrendering his passport, prohibiting travel, surrendering

his cash as bail or to a third party while his case is pending, and home detention with electronic

monitoring. These conditions would be more than adequate to mitigate any minimal risk that he

might *now* flee stemming only from the severity of punishment for the charges. There are

likewise sufficient conditions for this Court to impose to ensure the safety of the community

---

[5] To this day, there has been no legal finding of death for Linda Carman, let alone manner of death. Her status in Middletown, Connecticut Probate Court remains as "missing person."

upon Mr. Carman's release should the Court have concerns, including: no contact with potential government witnesses and electronic monitoring.

## V.  Conclusion

Because the law generally favors bail release, the government carries a dual burden in seeking pre-trial detention. Here, it is the government's burden to present sufficient evidence that Mr. Carman poses a serious flight risk by a preponderance of the evidence, or a risk of dangerousness by clear and convincing evidence. The government then must show with the same quantum of evidence that no condition or combination of conditions will reasonably assure Mr. Carman's presence at trial. For the reasons stated above, the government has not and will not be able to meet its burdens or make that showing, and Mr. Carman must therefore be released pending trial in this matter, with appropriate conditions as deemed necessary by this Court.

WHEREFORE, for the reasons set forth above, Mr. Carman respectfully requests that the Court grant the Defendant's Motion for Release on pre-trial conditions.

Dated: July 6, 2022

MICHAEL L. DESAUTELS
FEDERAL PUBLIC DEFENDER

By:    */s/ Sara M. Puls*_____
Sara M. Puls
Assistant Federal Public Defender
95 Pine Street, Suite 150
Burlington, Vermont 05401
(802) 862-6990
Counsel for Mr. Carman

By:    */s/ Mary M. Nerino*_____
Mary M. Nerino

21

Assistant Federal Public Defender
95 Pine Street, Suite 150
Burlington, Vermont 05401
(802) 862-6990
Counsel for Mr. Carman