DEFENDANT'S EXHIBIT
D

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

NATIONAL LIABILITY & FIRE )
INSURANCE COMPANY and BOAT )
OWNERS ASSOCIATION OF THE )
UNITED STATES, )
    Plaintiffs, )
 )
v. )    C.A. No. 17-038-JJM-PAS
 )
NATHAN CARMAN, )
    Defendant. )

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff National Liability & Fire Insurance Company and Boat Owners Association of the United States (collectively "National") issued a yacht insurance policy ("the Policy") to Defendant Nathan Carman, insuring a thirty-one-foot recreational sport fishing boat he purchased in December 2015. Nine months later, Mr. Carman's boat sank while he and his mother were out on a fishing trip off the coast of Long Island, New York; the boat was never recovered. He made a claim for the boat's insured value under the Policy. National investigated and denied his claim, filing this lawsuit for declaratory judgment and asking the Court to determine that the Policy does not cover Mr. Carman's loss. Mr. Carman filed Counterclaims against National about the Policy and its claims handling.

The parties presented their claims and defenses to the Court in a bench trial. Considering all the documentary evidence and witnesses' testimony, the Court finds that the Policy does not cover Mr. Carman's loss. Because the facts show that Mr.

Carman made improper and faulty repairs to his boat that contributed to its sinking, Exclusion D in the Policy excludes the claimed loss.

## *FINDINGS OF FACT*

This litigation brought to light certain facts about Mr. Carman, his family, his boat, and the events leading up to and after the boat sank. To focus on the claims at issue during this bench trial, however, the Court recites only the relevant facts underlying its inquiry into whether Mr. Carman's boat insurance covered his property loss and whether Mr. Carman has proven any of his Counterclaims asserting breach of contract and bad faith.[1]

### The Boat

1. Brian Woods, a lifelong boat builder and refurbisher, purchased a used lobster boat in 2007, which was originally a JC 31' plug. A plug is a mold that a boat manufacturer uses to manufacturer hulls. Mr. Woods named the boat "Chicken Pox."

2. Mr. Woods installed forward bulkheads of marine plywood to each side of the boat. He affixed the curved bottom of the plywood by fiberglass to the hull in the bilge, the top of the plywood butted to the deck above it, and the inboard

---

[1] To efficiently manage this lawsuit, the Court issued an Order bifurcating the trial, cueing up for trial only the four Counts that did not involve intentional acts–Counts I (Vermont Endorsement), II (*Uberrimae Fidei*), IV (Exclusion D), and VI (Breach of the Negative Implied Warranty of Seaworthiness)–and Mr. Carman's six Counterclaims. ECF No. 157. The remaining Counts III and V involved Policy exclusions for intentional conduct.

At the beginning of trial, National moved, and the Court granted its oral motion to dismiss Count I. Because the Court concludes after the trial that National properly denied coverage under Count IV (Exclusion D), there is no need to address in this order Counts II or VI, or to conduct another trial on the remaining intentional counts–Counts III and V.

perpendicular was tight and sealed with "3M Marine Adhesive Sealant 5200" against the fish box.

3. Mr. Woods testified that bulkheads on the boat provided structural strength and integrity to the boat and added some buoyancy because they formed air pockets in the event of flooding in the boat.

4. Mr. Woods installed two bilge pumps, one at the stern and one at the port cockpit hatch.

5. Mr. Woods also installed Bennett Marine trim tabs on the transom of the boat, to help trim the vessel by the bow. He installed them by following the manufacturer's directions. He drilled four ½ inch diameter holes through the transom, about 3-4 inches above the waterline, for thru-hull hydraulic connections to the four actuators that controlled the pitch of the trim tabs. The four ½ inch diameter holes were below the aft cockpit deck level and opened into the bilge, a few inches below the scuppers that are even with the aft cockpit deck.

6. In December 2015, Mr. Woods sold the boat to Nathan Carman for $48,000.

7. The Court found Mr. Woods' testimony to be credible.

Insurance Policy

8.  National Liability & Fire Insurance Company sold insurance through a marine insurance program with its general agent Boat Owners Association of the United States (d/b/a BoatU.S.).[2]

9.  Mr. Carman received an insurance quotation for a $66,200 agreed hull value policy ("the Quote"). The Quote indicated that it was an "all risk" Policy "subject to policy limits, warranties and exclusions." A few days later, Mr. Carman received a Marine Insurance Binder ("the Binder"), containing the terms from the Quote. The Binder showed that it was "A TEMPORARY INSURANCE CONTRACT" that would be "cancelled when replaced by a policy."

10. Before issuing the insurance, National hired marine surveyor Bernard J. Feeney to review the boat's condition to determine if it was seaworthy. Mr. Feeney inspected the boat and found the boat to be in good shape and seaworthy. The Court found Mr. Feeney's testimony to be credible.

11. The Yacht Policy (Policy No. 3985989-15) (Exhibit 25.3)[3] was mailed to Mr. Carman's home. The Policy echoed the language in the Quote and the Binder, covering property damage to his boat from any accidental cause up to the agreed

---

[2] Because Mr. Carman raises an issue as to which Policy terms were in effect at the time of his loss, the Court will briefly review the evidence of how Mr. Carman obtained the Policy from National. The Court will discuss the legal framework underlying its factual findings later in this Order when it discusses the issue of Count II of the Counterclaims. *See* page 13.

[3] Mr. Carman's Motion to Strike this exhibit is DENIED. ECF No. 166.

4

amount subject to the limitations and exclusions in the Policy. It was in effect for one-year beginning December 22, 2015.

12. Mr. Carman asserts that he did not accept the terms of the Policy, including its exclusions, because he never received the Policy (just the Binder). This assertion, however, is belied by the facts of the case. Mr. Carman effectively corresponded with National in March 2016, three months after the Policy went into effect, to increase the insured value to $85,000 following some upgrades, including his purchase of an autopilot, chart plotter, VHF radio, automatic identification system, and a life raft. Mr. Carman also made a claim with National in April 2016 against the Policy for engine damage and National paid him $33,489.33.

13. The Court finds from the record that this Policy (Exhibit 25.3) was the policy in effect at the time of the loss. National made all information about the Policy, including its terms and exclusions, available to Mr. Carman. In its communications with Mr. Carman about the Policy, National never misrepresented any material fact.

14. The Policy contained much of the standard property insurance policy language and exclusions. Relevant to this case, Exclusion D excluded coverage for "any loss, damage, expense or cost of repair caused directly or indirectly by incomplete, improper or faulty repair."

### Repairs Mr. Carman made to the Boat

#### *Bulkheads*

15. Mr. Carman removed the forward bulkheads.

### *Trim Tab Removal and Repair*

16. On Saturday September 17, 2016, the day he left Ram Point Marina to go fishing with his mother, Mr. Carman removed the trim tabs using an electric power drill. He took off the actuator from the transom leaving four half-dollar-size holes in the transom. At one point upon removing the three screws at the top of each trim tab, he had also to remove a fitting behind for the piston to come out to finish the job of removing the tabs. Mr. Carman drilled larger holes at each of those spots to enable him to remove that fitting through the hull.

17. Left with these larger holes in the hull and with a plan to fish that day, Mr. Carman bought a package of Epoxy Putty Stick and a Fiberglass Boat Repair Kit. He did not follow the package instructions on how to make the repairs to the holes. Instead, he filled the holes in the boat with the epoxy putty, using about ¾ of the stick from the package. The holes had no backing on them. He did not place the fiberglass mat fabric on the outside of the hull to seal the holes. Simply putting epoxy into the holes without a backing meant that the epoxy could get pushed through the holes.

### *Bilge Pumps*

18. Mr. Carman replaced the port bilge pump after it froze in early 2016.

19. After finding oil in the bilge in early September 2016, Mr. Carman brought the boat to Point Judith Marina. Mechanics there diagnosed a continuing electrical problem with the port bilge pump. The bilge pumps were not functioning properly.

20.  The day before he left to fish, Mr. Carman found water in the bilge again. He replaced the port bilge the next day.

### The Insurance Claim

21.  Mr. Carman's boat sank on September 18, 2016. He reported a claim for property insurance coverage on October 7, 2016.

22.  The insurance company promptly investigated the claim. Because of the unusual nature of the claim, i.e. Mr. Carman was alone out at sea on a raft for many days after the boat sank and the boat was never recovered, National issued a reservation of rights. It assigned a marine surveyor to review the claim. It examined Mr. Carman under oath. Ultimately, National denied Mr. Carman's claim about four months after Mr. Carman made his claim.

23.  Martha Charlesworth, BoatU.S.'s marine insurance legal counsel, described the claim review process. National kept Mr. Carman fully informed as the investigation progressed and invited him to submit any material for its consideration of the claim. Ms. Charlesworth's testimony was credible.

24.  The Court found the claim review process to be fair and transparent and that National processed the claim efficiently and in good faith.

## *CONCLUSIONS OF LAW*

### Court's Jurisdiction

21.  The Court has subject-matter jurisdiction over this dispute because it involves a contract of marine insurance on a vessel under admiralty and maritime jurisdiction, 28 U.S.C. § 1333, and under the Federal Declaratory Judgment Act, 28

U.S.C. § 2201. "Suits on maritime insurance policies are classic examples of matters within federal maritime jurisdiction." *Central Int'l Co. v. Kempter Nat'l Ins. Cos.*, 202 F.3d 372, 373 (1st Cir. 2000); *Windsor Mount Joy Mut. Ins. Co. v. Giragosian*, 57 F.3d 50, 54 (1st Cir. 1995) ("The propriety of maritime jurisdiction over a suit involving a maritime insurance policy is unquestionable.")

Applicable Law

22. Federal maritime law applies to marine insurance contracts. *Lloyd's of London v. Pagan-Sanchez*, 539 F.3d 19, 25 (1st Cir. 2008). If there is an absence of a federal maritime rule on point, however, the appropriate state law will apply to interpreting the marine insurance contract. *See Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 27 (2004) ("A maritime contract's interpretation may so implicate local interests as to beckon interpretation by state law.").

23. The basic policy underlying contract law is to protect the expectations of the parties. The language of the policy governs the interpretation of the parties' expectations. "In construing an insurance policy, disputed terms should be read according to their plain, ordinary and popular meaning. Because a policy is prepared by the insurer, all ambiguities must be resolved in favor of the insured." *State v. CNA Ins. Cos.*, 779 A.2d 662, 667 (Vt. 2001) (citations omitted).[4]

---

[4] In accordance with choice of law rules, the Court looks to the "center of gravity" of the policies' formation to decide which state's law applies. *See Albany Ins. Co. v. Wisniewski*, 579 F. Supp. 1004, 1013 (D.R.I. 1984). Because the Policy was formed and mailed to Mr. Carman's home in Vermont, that state's law applies where appropriate.

### National's Claims

The Court will now turn to National's causes of action. Conscious of its mandate to decide only issues it needs to in order to provide a final judgment, the Court focuses first on Count IV rooted in Exclusion D because, in hearing the evidence and reflecting on the applicable law, that claim resolves the entire case.

24. Mr. Carman's Policy contained an Exclusion D. The Exclusion provides that there is no coverage for "any loss, damage, expense or cost of repair caused directly or indirectly by incomplete, improper, or faulty repair." There is no dispute that the language of this Exclusion is clear and unambiguous.

25. When a policy exclusion is being invoked, "[t]he insurer bears the burden of showing that an insured's claim is excluded by the policy." *Shriner v. Amica Mut. Ins. Co.*, 204 Vt. 321, 324 (2017).

26. National met its burden of proving that Exclusion D applies to Mr. Carman's claim. The credible evidence that leads the Court to conclude that the repairs Mr. Carman made to the boat were incomplete, improper, and faulty include the following:

   a. The evidence shows that Mr. Carman's transom hole repairs were incomplete, improper, and faulty because he filled the holes with epoxy and did not use fiberglass as an exterior seal. The removal of the trim tabs and the faulty repairs rendered the boat unseaworthy and in poor condition. Having four holes in the back of a boat lends itself to taking

water on. It is more likely than not that this improper repair at least indirectly caused water to fill up the bilge, causing the boat to sink.

b. The removal of the bulkheads diminished the integrity and strength of the boat, rendered the boat in poor condition under the marine grading system, and made the boat less seaworthy. The removal increased the risk that that boat would come into safety troubles by eliminating reserve buoyancy forward in the boat. If the boat flooded, that area of the boat no longer had an air pocket, so it would flood the entire bilge area. If the forward bulkhead had been in place, the boat would have flooded at a slower rate.

27. There was no evidence to rebut these facts or conclusions.[5]

28. The credible evidence that leads the Court to conclude that the improper and faulty repairs that Mr. Carman made to the boat contributed to the sinking include the following:

a. Mr. Feeney, the marine surveyor, opined that Mr. Carman's boat sank because water intruded through inadequately sealed holes below the scuppers with exterior covers. That water accumulated inside the hull because of the failing bilge pumps and the water flowed forward.

---

[5] Christopher Roth, Sr. testified in support of Mr. Carman. However, he conceded that the repairs Mr. Carman made to the holes were incomplete because he did not seal the exterior of the holes with fiberglass. His testimony was inconsistent with all the other credible testimonial and documentary evidence, and thus the Court found his testimony was not credible.

Because Mr. Carman removed the bulkheads, eliminating what would have been air pockets, the boat sank.

b. Jonathan Klopman, an expert marine surveyor, testified that if he had been asked by an insurance company to inspect the boat after Mr. Carman puttied the holes he made by removing the trim tabs, he would have reported that the insured performed amateurish and inadequate repairs. Considering Mr. Carman's intent to use his boat to fish offshore, Mr. Klopman would have recommended that the underwriter place the boat on port risk ashore so that the holes could be plugged, feathered, and properly patched with fiberglass.

c. Mr. Klopman also opined there was no sound or practical reason for Mr. Carman to cut away the bulkheads and their removal increased the risk that that boat would come into safety troubles. For example, if the boat flooded, that area of the boat no longer had an air pocket, so it would flood the entire bilge area. Mr. Klopman determined that the boat sank faster because Mr. Carman removed the bulkheads.

d. The Court found Mr. Klopman's testimony credible.

e. Naval architect Eric Greene opined that Mr. Carman's repairs made the boat unseaworthy. He used improper materials to repair holes close to the waterline, especially when he intended to troll for five hours at slow speed with a following sea on the same day he made the repairs. Mr. Greene opined that there was a high likelihood that water entering from

11

the inadequately filled holes would gradually fill the bilge. The Court found Mr. Greene's testimony credible.

29. Based on the unrebutted expert opinions, and all the credible evidence, the Court finds that Exclusion D applies here because Mr. Carman's property loss was caused directly or indirectly by incomplete, improper, and faulty repairs. Thus, the Court holds that National has no obligation under the Policy to pay Mr. Carman's Claim No. 1607671 for loss, damage, or expenses.[6]

The Court's findings of fact, when applied to applicable law resolves the case National brought against Mr. Carman. While the remaining claims presented other ways to decline coverage or void the Policy, there is no need to fish in an empty barrel.[7] National appropriately denied coverage and judgment will enter in its favor on Count IV.

<u>Nathan Carman's Counterclaims</u>

Mr. Carman filed six Counterclaims in response to National's Complaint. The Court's decision in favor of National on Count IV obviates a lengthy discussion of these Counterclaims, but it will now address those briefly.

---

[6] To be clear, the Court is making no determination of whether Mr. Carman intended to sink his boat or to harm his mother. Those allegations are not a part of the counts the Court heard during the trial of this civil case.

[7] Count II asserts that the Policy is void under the maritime law principle of *uberrimae fidei*, which allows an insurer to void a policy of insurance when an insured fails to disclose to the insurer all circumstances known to him and unknown to the insurance company that "materially affect the insurer's risk." *Catlin at Lloyd's v. San Juan Towing & Marine Servs., Inc.*, 778 F.3d 69, 83 (1st Cir. 2015). Count VI urges no coverage under the Policy's negative implied warranty of seaworthiness.

### Count I–Breach of Insurance Contract

30. Count I alleges that National breached the Policy by denying Mr. Carman's claim. As the Court found in accordance with the facts and law cited above, National properly denied coverage for the loss under Exclusion D so did not breach the insurance contract. Therefore, Mr. Carman has failed to establish by a preponderance of the evidence that he is entitled to relief under Count I of his Counterclaim. The Court DISMISSES Count I of Defendant's Counterclaim.

### Count II–Breach of Sales and Insurance Contract

31. Mr. Carman claims that the Quote and Binder that he received represented "a legally enforceable contract." He claims National breached the agreement by not providing him with the insurance set forth in the Quote and/or in the Binder.

32. To begin coverage, insurance companies, as here, issue a "Binder," or "preliminary insurance contract, that covers the applicant until the insurance company either issues a policy or refuses the risk." *In re Waste Sys., Int'l, Inc.*, 317 B.R. 650, 655 (D. Del. 2004) (citing Lee R. Russ & Thomas F. Segalla, 1 Couch on Insurance 3d § 13.1). "A binder is not an insurance policy, but it is considered a contract providing interim insurance from the date of the application until either completion or rejection of the principal policy." *Id.* at 655 (citing 1 Couch, supra at § 13.2). "Generally a contract of temporary insurance–the binder–is terminated by the issuance of a policy, or by a rejection of the application. If no policy is issued, and the binder is not otherwise terminated, it continues until the time fixed for its

termination or a reasonable time has expired." *Id.* at 656 (citing 1 Couch, supra at § 13.9). A policy is considered issued and delivered when executed by the insurance company and mailed to the insured. 1A Couch on Insurance, § 14:15 (3d ed. June 2019).

33. National executed Policy No. 3985989-15 and mailed it to Mr. Carman with Michael Pellerin's December 23, 2015 cover letter. The Court finds that the Quote and Binder merged into the subsequently issued Policy. Mr. Carman initiated a supplement to that Policy when he requested an increase in coverage for the boat's agreed hull value to $85,000 through the Endorsement. The Court found Mr. Pellerin's testimony to be credible.

34. The Policy was the operative contract, not the Binder or the Quote, and because the Court found that National did not breach the Policy and dismissed Count I of the Counterclaim, it DISMISSES Count II of the Counterclaim on the same grounds.

<u>Counts III, IV, V, and VI–Duty of Utmost Good Faith and Fair Dealing</u>

35. In each of these four Counterclaims, Mr. Carman alleges under maritime and various state laws that National breached its duty of utmost good faith and fair dealing by engaging in unfair and deceptive practices based on BoatU.S.'s status as a membership organization, its relationship with National, its "bait and switch" sales practices (Counts III, V), and in connection with National's claims handling and payments (Counts IV, VI).

36. To establish a claim for bad faith under Vermont law, "a plaintiff must show that (1) the insurance company had no reasonable basis to deny benefits of the policy, and (2) the company knew or recklessly disregarded the fact that no reasonable basis existed for denying the claim." *Bushey v. Allstate Ins. Co.*, 670 A.2d 807, 809 (Vt. 1995).

37. The Court found that the repairs and alterations Mr. Carman made to his boat were faulty, causing the boat to become unseaworthy, and directly or indirectly causing the loss. National had a reasonable basis for denying Mr. Carman's insurance claim under Exclusion D of the Policy. The Court further finds that the evidence shows that National executed its investigation and claims review professionally, fairly, and in good faith. The Court DISMISSES Counts III, IV, V, and VI of the Counterclaims.

## Conclusion

Based on all the evidence presented at trial, the Court finds that Mr. Carman's boat was unseaworthy when it left Rams Point Marina on September 17, 2016 because he improperly repaired the holes he created by removing the trim tabs, and he compromised the boat's stability by removing the bulkheads. The unseaworthy state of the boat brought about by the faulty repairs, at least indirectly caused it to sink. National appropriately denied coverage for the resulting property loss after a good faith investigation.

a. Judgment shall enter for National as to Count IV of its Complaint and as to each of the Counts in the Counterclaims.[8]

b. The Court DISMISSES AS MOOT the remaining two Counts presented during the bench trial, Counts II and VI.

c. The Court DISMISSES Nathan Carman's Counterclaims Counts I through VI.

d. It is not necessary to consider National's remaining claims in Counts III and V[9] severed by the Court, because the Court has determined that National appropriately denied coverage under Exclusion D granting judgment in its favor on Count IV. The Court thus DISMISSES AS MOOT Counts III and V.

IT IS SO ORDERED.

*/s/ John J. McConnell, Jr.*

John J. McConnell, Jr.
United States District Judge

November 4, 2019

---

[8] National's oral motions for declaratory judgment made on August 23, 2019 and September 4, 2019 are DENIED AS MOOT.

[9] Count III invokes an exclusion of coverage for a non-fortuitous loss for faulty repairs, like Exclusion D. Count V involves Exclusion F, which excludes coverage when the loss was "caused intentionally by, with the knowledge of, or resulting from criminal wrongdoing" of the insured.

16