UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Docket No. 5:22-CR-49 |
| | ) |
| NATHAN CARMAN, | ) |
| Defendant. | ) |

**OPPOSITION TO DEFENDANT'S MOTION
FOR RELEASE ON PRE-TRIAL CONDITIONS**

On May 2, 2022, a federal grand jury returned an indictment charging defendant Nathan Carman with a variety of offenses involving the murders of his grandfather, John Chakalos, and his mother, Linda Carman. Count Seven of the indictment specifically alleges the murder of Linda Carman and carries a mandatory minimum sentence of life without parole. Carman was arrested on May 10, 2022. On May 11, 2022, the government moved for Carman's pretrial detention. *See* Doc. 8. Initially, Carman did not oppose the government's motion for detention, and instead sought to defer any request for release. On May 16, 2022, the Court issued an order of detention (*see* Doc. 19), noting that the government's motion was unopposed. Carman has now moved for pre-trial release (*see* Doc. 27), which the government opposes for the reasons stated in its initial motion for detention as well as the reasons set forth below.

The charges against Carman include a scheme in which he sought to defraud the estate of his grandfather, its executor, the Chakalos Family Dynasty Trust, and its trustees. As a central part of this scheme, Carman murdered both his grandfather and his mother, then concocted cover stories to conceal his involvement in those killings. During the cover-up, Carman misrepresented his involvement in and responsibility for those deaths to law enforcement, to his family, to those who made inquiries about the deaths and their circumstances, and to others who challenged his cover-up or challenged his rights to his grandfather's assets.

1

Carman's motion for release fails to adequately address the risk of flight and similarly fails to address his dangerousness. Moreover, the conditions of release he proposes would do little to mitigate these concerns. Many of the claims made by Carman in support of his request for release are misleading or mistaken. For the reasons set forth below, as well as those in the government's initial motion for detention, Carman poses a risk of flight; Carman poses a danger; and there are no conditions of release which will mitigate either concern. Accordingly, the Court should deny Carman's motion for release.

ARGUMENT

I. Carman Poses a Risk of Flight

The Bail Reform Act does not require the government to show that Carman will actually flee – rather, it asks whether the defendant poses a *risk* of flight. *See* 18 U.S.C. § 3142(f)(2)(A). A finding of risk of flight must be supported by a preponderance of the evidence. *See*, *e.g.*, *United States v. Patriarca*, 948 F.2d 789, 793 (1st Cir. 1991); *United States v. Jackson*, 823 F.2d 4, 5 (2d Cir. 1987); *United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985). If the government establishes a risk of flight, the Court must consider whether there are potential conditions of release that will *assure* the appearance of the defendant. Id. at § 3142(f).

As a preliminary matter, there are undisputed circumstances which establish, by a preponderance of evidence, that Carman poses a risk of flight. He is charged with an offense carrying a mandatory life sentence, and he has few connections that would encourage him to remain in the United States. These undisputed circumstances alone demonstrate a risk of flight.

Carman makes several false or misleading statements in an effort to counter the obvious conclusion that he poses a risk of flight. For instance, Carman states that he "answered every question put to him in the civil case regarding his alleged involvement in the murder." Doc. 27,

at *12.  Carman's assertion misconstrues the record from his prior civil cases.  In one deposition alone, Carman declined to answer more than eighty questions, including numerous questions about firearms, such as the Sig Sauer assault rifle he used to murder his grandfather.  Carman's purported acquiescence cannot be squared with the record.

Carman also suggests that he is not a risk of flight because he "spoke to law enforcement." *Id.*  However, Carman's conversations with law enforcement involved lies and deception.  During an interview immediately after the murder of John Chakalos, Carman stated that he had not fired a gun "in years."  During a subsequent interview, Carman was asked if he had purchased any firearms.  In response, Carman acknolwedged that he had purchased a shotgun after his grandfather was killed, but he specifically denied "any other purchases of firearms."  However, records show that approximately six weeks prior to the murder of John Chakalos, Carman purchased a Sig Sauer 716 .30 caliber rifle – the same caliber as the weapon used in the killing of John Chakalos.  Carman also declined to show the Windsor Police Department the route he traveled when he purportedly got "lost" – in an area with which he was quite familiar – during a one-hour period of time when his phone was turned off, foreclosing the possibility that his location could be discerned from cell towers.  Carman's attempts to characterize his prior statements – or lack thereof – as transparent and forthright should be regarded as unpersuasive.

Carman also suggests that he is not a risk of flight because he "spoke with the media." *Id.*  However, Carman's engagement with the media was cut short when questions were posed

which could implicate his guilt.[1]  For example, Carman suddenly refused to continue answering a question regarding Linda Carman's disappearance:

> REPORTER: "[Linda Carman] was concerned about safety?"
> CARMAN: "That's correct.  It was not an argument.  I was kind of pestering my mom.  She had always been kind of skittish.  We're stopping right there with that question.  We're stopping right there."

On another occasion, Carman stood up and walked out of the interview:

> REPORTER: "Another thing that's happened since we last got together – police searched your mom's home.  Did you know anything about that?"
> CARMAN: "Yeah, we're done for this evening.  Period.  We're done here."

Carman additionally asserts that he always appears in court, stating that he was "forced to defend himself" in connection with civil litigation.  In fact, Carman's civil case in the District of Rhode Island was the result of Carman's own insurance claim.  Carman had a financial incentive to appear not only in that case – where he was seeking a payout on his insurance claim – but also in a New Hampshire probate case in which he sought to ensure that he would receive a portion of his grandfather's fortune.  His appearance in each of those cases in fact furthered his fraudulent scheme.  Carman is now charged with multiple crimes, and he faces a mandatory life sentence.  Consequently, his incentives to appear in the instant case bear no relation to his incentives to appear during his prior civil cases.

Carman indicates that he has "solid ties to the community," yet the letters of support he submits come primarily from individuals who knew him only as a child.  For example, Renee Scarpantonio appears to have last seen Carman over a decade ago when he was only 15 or 16.

---

[1] *See* "Lost at Sea."  20/20, Season 36, Episode 7.  February 3, 2017.  Available at: https://abc.com/shows/2020/episode-guide/2017-02-03-020317-lost-at-sea

4

The fact that Ms. Scarpantonio never witnessed any outbursts suggests that she had little visibility into Carman's life and is therefore poorly positioned to opine on his dangerousness. Similarly, aside from a coincidental encounter, Richard Sabato does not appear to have seen or heard from Carman since he was a child. The relevance of Carman's connection to a local church is also questionable: during the execution of a federal search warrant at Carman's residence, investigators observed a copy of the Quran displayed prominently in Carman's bedroom. Contrary to Carman's attempt to show otherwise, his lack of community ties weighs heavily in favor of a finding that he is a risk of flight.

Finally, the $10,000.00 found in Carman's home is more than enough to fund his flight. Carman could easily cross the Canadian or Mexican border with these funds. He also has additional assets including his house, his truck, and new boats, and thus has the ability to raise funds well beyond $10,000.00. Carman is alleged to have successfully evaded detection at sea, and his new boats – including one named "Out Foxed" – could be used to escape the United States and again evade authorities. Carman's assertions in his motion for release fail to undercut the conclusion that the evidence shows, by a preponderance, that he poses a risk of flight.

    II.    <u>There is Compelling Evidence of Carman's Guilt</u>

While some of the evidence against Carman is circumstantial, at trial the government anticipates that the Court will instruct the jury that "…the law draws no distinction between direct and circumstantial evidence in requiring the government to carry its burden of proof." *United States v. MacPherson*, 424 F.3d 183, 190 (2d Cir. 2005) (*citing United States v. Glasser*, 443 F.2d 994, 1006–07 (2d Cir. 1971). Furthermore, a verdict of guilty may be based entirely on circumstantial evidence. *Id.* (*citing United States v. Morgan*, 385 F.3d 196, 204 (2d Cir. 2004). In any event, there will be compelling evidence of guilt at any trial in this case, which weighs

heavily in favor of detention. The Court and Carman are familiar with this evidence from the affidavit in support of the warrant to search Carman's residence.

This instant case is complex, and thus the government does not attempt to detail the entirety of the evidence here. Rather, the government urges the Court to consider several points. First, Carman is the only person with both the motive and opportunity to kill both John Chakalos and Linda Carman. Prior to the murder of John Chakalos, Carman showed a keen interest in the specifics of his grandfather's trust. He sent Chakalos' trust attorney a series of nineteen questions about the trust, which began as follows:

> My interest is in learning what the trust(s) means to me now and what it could or will mean to me in the future. In order to satisfy this interest I will ask questions each of which will fall into one of three categories, the organizational structure of the trust(s), what the trust(s) mean(s) to me now, and how that meaning will change if or when certain scenarios present themselves in the future. After asking each question I will give you a chance to respond. Now for my first question.

As to the murder of John Chakalos, Carman was the last person to see Chakalos alive; he was one of the few people who had a key to Chakalos' home; and he was one of the few people who knew that Chakalos would be alone the night he was murdered. Further, Carman purchased a rifle of the same caliber used to murder Chakalos just six weeks prior to the killing, then lied about his involvement with the weapon. Moreover, shortly after Chakalos' death, Carman was overhead asking God for forgiveness.

Additionally, Carman's story regarding the circumstances of Linda Carman's death is demonstrably false. Expert drift analysis disproves his account of his time at sea, and shows that his life raft could not have ended up in the location where he was discovered had his boat sank at the time and location he claims. Other aspects of Carman's story simply don't make sense: during interviews Carman described little interaction with or reaction from his mother during the

several minutes the boat was sinking, and he provided no reasonable explanation for why he failed to utilize his radio or emergency beacon. Carman's physical condition was also inconsistent with someone who had been at sea for an extended period of time, and a naval architect refutes Carman's story about the manner in which his boat sank. Significantly, Carman discarded his computer hard drive and GPS unit around the time of the murder of John Chakalos, and again discarded his computer hard drive around the time of the murder of Linda Carman. The evidence of Carman's guilt is compelling, and the Court should find that the weight of the evidence favors detention.

   III. <u>Carman Poses a Danger to Others</u>

  A finding of dangerousness must be supported by clear and convincing evidence. *See, e.g., United States v. Ferranti*, 66 F.3d 540, 542 (2d Cir. 1995); *Patriarca*, 948 F.2d at 792; *Chimurenga*, 760 F.2d at 405. Carman's offenses involve two murders. He is alleged to have carefully planned the killing of the two people closest to him in order to financially benefit from their deaths. He has demonstrated an ability to obtain and use firearms. He also has a significant motive to kill to secure his liberty, or to retaliate against those who he believes put him in criminal jeopardy or are undermining his scheme. These facts establish by clear and convincing evidence that Carman poses a danger to others. The government notes that two of Carman's aunts have signed a letter on behalf of the Chakalos family detailing their fear of Carman's potential release. Carman's murder of two of their family members demonstrates that their fears are well-founded.

  In his attempt to claim he is not a danger, Carman again relies on mistaken assertions. He characterizes his history of involvement with firearms as "incredibly limited, at best." Preliminarily, even limited involvement with firearms can demonstrate dangerousness. Indeed,

Carman's discharge of just two bullets had fatal consequences for John Chakalos.  Nevertheless, Carman's involvement with firearms – including rifles, shotguns, and handguns – is far from limited.

In 2014, law enforcement found handwritten notes in Carman's residence pertaining to "sniper rifles."  More specifically, the notes related to "sniper rifles on an aerial video stabilizing platform and camera with facial recognition data machines."  The notes also contained details about constructing self-propelled improvised explosive devices.  Investigators additionally observed evidence of experimentation with electrical circuitry on Carman's kitchen table.  Around this same time, Carman also possessed at least two different shotguns.  Thereafter, in 2015, Carman enrolled in a handgun training course.  Notably, Carman enrolled in a 102-level course that required prior knowledge of how to load and fire a handgun, as well as the completion of a 101-level course.  Finally, records suggest that just eight days before his final "fishing trip" with his mother, Carman was engaged in a transaction involving AR-15 accessories bearing the same unique "dark earth" color as the rifle Carman used to kill his grandfather.  Notwithstanding numerous questions posed to Carman about the whereabouts of the Sig Sauer assault rifle he purchased, the rifle remains unaccounted for, and Carman's potential access to it poses a grave danger.

Carman also states that he "had a good relationship with his mother" and indicates that he "[h]ad all he could want, and more, in terms of financial support."  To the contrary, Carman's relationship with his mother was anything but normal.  Witnesses make clear that Linda Carman only saw her son sporadically.  Moreover, by the time of Linda Carman's death, Nathan Carman had spent nearly all of the money he had received after the killing of his grandfather.  He needed a new source of funds, and Linda Carman was unwilling to provide her son with financial

support.  In fact, before her death, Linda Carman changed her will to remove Nathan Carman as a beneficiary.  Then, in 2016, John Chakalos' daughters discussued the dissolution of the Chakalos Family Dynasty Trust.  Because Carman was no longer the beneficiary of his mother's estate, the dissolution of the Dynasty Trust would have resulted in him losing the "guarantee" that he would be the eventual beneficiary of one quarter of his grandfather's wealth.

Carman incorrectly states that a federal court in Rhode Island "already considered" the argument that he sunk his boat to kill his mother.  In fact, that court's findings of fact – attached to Carman's motion – states, "To be clear, the Court is making no determination of whether Mr. Carman intended to sink his boat or harm his mother."  Doc. 27, Ex. 5.  Carman's statement that "at least one federal grand jury declined to indict him" is also untrue.  To the contrary, the only federal grand jury to have considered an indictment in this matter in fact returned the instant charges against Carman.

Carman's motion includes several other statements refuted by the evidence.  He indicates that his "whereabouts were accounted for" at the time of John Chakalos' murder.  However, Carman's whereabouts are *unaccounted for* during a one-hour period when he indicates he was "lost" on his way from his apartment to meet his mother.  Carman says other suspects in the murder of John Chakalos include "other family members," but he neglects to mention that he is the only family member who refused to submit to a polygraph examination.  In any event, Carman cannot claim that any other family member killed his mother.  The inescapable conclusion to be drawn from this clear and convincing evidence is that Carman poses a danger.

    III.    <u>Carman's Mental Health</u>

Carman attempts to downplay the significance of his mental health history.  The government noted in its initial motion for detention that Carman presents with a serious

childhood history of mental health issues, that he lacks any serious diagnosis of his mental conditions as an adult, and that he has avoided mental health treatment. Carman counters with the claim that he suffers only from Autistism Spectrum Disorder. To the contrary, mental health records are replete with treatment statements about the lack of a clear diagnosis before Carman stopped seeing mental health professionals. Further, it is uncontested that he has received no recent diagnosis or treatment as an adult. Carman has been evaluated twice for involuntary commitment, once in 2011 and again in 2014, but neither evaluation involved the kinds of tests and analysis necessary for a firm diagnosis. Most significantly, neither evaluation provides assurances for the Court that temper the risk of flight and danger to those involved with the instant case.

Carman states that in 2011, when he was ordered evaluated for the first time, he was "not deemed to need inpatient treatment, nor was he ordered to take any medications." Doc. 27, at *7. However, a consulting physician "strongly recommend[ed]" inpatient treatment, and indicated that he "strongly believe[d] that there is some kind of psychotic phenomenon going on." Records also state, "Given poor insight and compromised judgment following significant decline in functioning, inpatient level of care to be sought." In 2014, when Carman was ordered evaluated again, the same doctor wrote, "[Carman] does not feel he needs to be an inpatient. I discussed several options including extended stay for observation and monitoring, but he is refusing." The doctor nonetheless recommended "outpatient psychiatric follow up," but it does not appear that Carman actually complied with this recommendation.

Carman also refused doctors' attempts to prescribe medication. A discharge summary describes a decision "that mediciation would not be pushed on patient at the time, though if he was not going to be taking medication, he needed to be participating in the rest of treatment."

Carman again appears not to have complied.  Carman's motion suggests that he was medicated only for "common conditions such as ADHD, depression, and anxiety."  In fact, he was also treated with an antipsychotic medication often used to treat schizophrenia and bipolar disorder before he discontinued medication altogether.  In spite of serious and continuing questions about his mental health, Carman has simply refused treatment by professionals.

A more recent assessment of Carman's mental health comes from one of his neighbors.  During an interview with law enforcement, Carman's neighbor described personal familiarity with mental illness by virtue of two family members diagnosed with schizophrenia.  Carman's neighbor described Carman as "mentally unhealthy" and indicated that Carman is "worse" than both of the neighbor's schitzophrenic relatives.  Carman's neighbor also described observing Carman throwing what the neighbor believed was human excrement into Carman's yard.  Relatedly, during the execution of a search warrant following Carman's arrest, investigators also observed the insalubrious condition of Carman's home, including what appeared to be maggots in Carman's refrigerator.

IV.    Carman's Proposed Condition of Release

Carman spends the bulk of his motion seeking to counter the government's argument that he poses a risk of flight and a danger to others.  He makes little attempt to argue that, if the Court finds that the government has proven these risks, the Court can be assured that the risks can be mitigated by conditions of release.  Carman's only meaningful proposal appears to be that the Court could order the Probation Office to conduct electronic monitoring of Carman.  The Court should conclude that such monitoring cannot sufficiently mitigate either risk.  To begin with, location monitoring in rural Vermont often faces serious technological difficulties.  But even if it worked, electronic monitoring could not assure the Court that Carman would not flee.  Carman

has the wherewithal to remove a monitoring device and flee before anyone could determine where he has gone. An international border is mere hours from Carman's Vernon home. Most importantly, electronic monitoring does nothing to prevent Carman from retaliating against a witness or others as he flees. The Court should therefore conclude that there are no conditions of release which would reasonably assure Carman's appearance and the safety of the community.

## CONCLUSION

For the reasons set forth above, the government asks the court to order Carman's continued detention pending trial.

Dated at Burlington, in the District of Vermont, July 22, 2022.

                                                  Respectfully submitted,

                                                  NIKOLAS P. KEREST
                                                  United States Attorney

By:    */s/ Nathanael T. Burris*
        Nathanael T. Burris
        Paul J. Van de Graaf
        Assistant U.S. Attorneys
        P.O. Box 570
        Burlington, VT 05402-0570
        (802) 951-6725
        nate.burris@usdoj.gov