UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Docket No. 5:22-CR-49 |
| | ) | |
| NATHAN CARMAN, | ) | |
| Defendant. | ) | |

GOVERNMENT'S OPPOSITION
TO DEFENDANT'S MOTION FOR GRAND JURY MINUTES

Defendant Nathan Carman seeks extraordinary access to grand jury testimony that led to the pending indictment. Like virtually every federal defendant, he has not reviewed the evidence presented to the grand jury prior to its return of a true bill. Carman fails to acknowledge the heavy burden to gain such access. He presents nothing more than speculation about the evidence presented to the grand jury. He offers no specific evidence that anything inappropriate took place during the grand jury proceedings. Rather, he relies on flawed readings of the charges and the law. Despite these failures, based on its normal, generous discovery practices, the government will make transcripts of the testimony of the federal agents who testified in the grand jury available to the defense. Accordingly, the Court should deny the motion on two grounds. First, the motion is moot because the government will make the transcripts available to the defense as part of its generous discovery practice. Second, Carman has not demonstrated a sufficient basis for the Court to order disclosure.

I.      The Indictment

As the government outlined in its opposition to Carman's motion for a bill of particulars, the indictment presents a detailed description of the double-murder fraud scheme charged in Counts One through Six. The indictment begins with several paragraphs alleging: The fortune

amassed by John Chakalos – Carman's grandfather – flows into the Chakalos Family Dynasty Trust. The trustees of the Dynasty Trust have discretion about the distribution of Dynasty Trust assets. Doc. 1 at 1-2. In 2012 and 2013, when he was 18 and 19 years old, Carman questioned John Chakalos's financial advisors about Carman's "financial interests in John Chakalos's assets and the operation of the trusts." *Id*. at 2. In addition to derivative beneficiary status in the trust, Carman would receive hundreds of thousands of dollars from two banks accounts upon John Chakalos's death,. *Id.*

The indictment then outlines the scheme in paragraphs 7 through 22. It begins with a general description of the scheme beginning in 2013. *Id.* at 3. It specifically alleges that "Carman devised a scheme to defraud the Estate of John Chakalos, its executor, the Dynasty Trust, and its trustees, and to obtain money from the Dynasty Trust by materially false and fraudulent pretenses, representations, and promises." It charges that "as a central part of the scheme, Nathan Carman murdered John Chakalos and Linda Carman," and that he "concocted cover stories to conceal his involvement in the killings." *Id.*

The indictment then illustrates the following aspects of Carman's execution of the scheme. In November 2013, Carman obtained a New Hampshire driver's license and used it to buy a Sig Sauer rifle, which he used to kill his grandfather on December 20, 2013. *Id.* Carman discarded his computer hard drive and GPS unit. *Id.* He provided false information to the police investigating the Chakalos murder, such as his whereabouts at a critical time and his purchase of the Sig Sauer. *Id.* at 4. Carman lived off the proceeds from the Chakalos beneficiary-on-death accounts until he took Linda Carman on a fishing trip on September 17, 2016. *Id.* As with the Chakalos murder, Carman made sure that his computer would not be found by police during his absence on the supposed fishing trip. *Id.* at 5. Carman killed his mother and avoided detection by

the Coast Guard until September 25, 2016. *Id.* He then lied to various investigators "about what happened to Linda Carman and about what occurred on the *Chicken Pox.*" *Id.* He also repeated false statements about both murders during insurance and probate litigation, to further his fraudulent cover stories. *Id.* at 5-6.

In his motion, Carman makes a variety of mistaken claims about the charges. To begin with, he repeatedly refers to the John Chakalos's murder as "uncharged." To the contrary, the indictment specifically charges Carman with killing John Chakalos as part of the scheme to defraud. In this sense, the murder is charged, even if the specific offense charged is not murder. It is not uncommon for federal prosecutors to charge murder as part of an insurance fraud, where the murder plays an important role in the attempt to obtain money by deceit. *See*, *e.g.*, *United States v. Epps*, 742 Fed. Appx. 544 (2d Cir. 2018); *United States v. Gray*, 405 F.3d 427 (4th Cir. 2005); *United States v. Wharton*, 320 F.3d 526 (5th Cir. 2003); *United States v. Hartman*, 985 F.2d 774 (7thCir. 1992); *United States v. Calvert*, 523 F.2d 895 (8th Cir. 1975). As in this case, the wire fraud statute also criminalizes a murder scheme aimed at obtaining funds from a trust rather than an insurance company. *See United States v. Poole*, 451 Fed. Appx. 298 (4th Cir. 2011).

Carman also asserts that the murder allegation is "unadjudicated." Most federal charges pertain to conduct which is unadjudicated. Federal prosecutors rarely charge conduct that had been previously adjudicated. Indeed, most defendants charged in federal court with crimes involving murder have not been previously charged or convicted with murder. Further, Carman repeatedly asserts that the Chakalos murder "appears to be the sole basis for Counts One through Six." This assertion misconceives the fraud scheme, which clearly charges that the scheme involved two murders, not one.

II.    <u>Discovery</u>

The government has provided early and generous discovery in this matter, including many statements of and reports about potential witnesses. The Jencks Act requires the production of such discovery after the witness testifies, 18 U.S.C. § 3500(a), but this Office often produces witness statements two weeks or thirty days before trial. Here, the government provided these prior statements shortly after arraignment and before the Court has even set a trial date.

Carman posits that the government presented evidence to the grand jury about the Chakalos murder. Carman is correct. The government, of course, seeks to present evidence about all the factual allegations in an indictment. Here, the government presented evidence to the grand jury through the testimony of various federal law enforcement witnesses who were involved in the investigation of Carman. These agents may well testify during the trial about limited matters. Nevertheless, it is the government's practice in this district to provide the defense with access to such grand jury testimony, as potential Jencks Act information, prior to trial.

Despite the Court's local rule requiring counsel to consult about discovery before filing a motion, D. Vt. Rule 16(f),[1] Carman's counsel did not make a specific request to the government for access to particular grand jury transcripts prior to filing its motion. The government has on several occasions expressed its willingness to consult informally about discovery or other matters. Had the defense requested early access to these potential Jencks Act statements, the government would likely have agreed and avoided the need for this litigation. In short, the

---

[1] Rule 16(f) – also applicable to Carman's motion for bill of particulars – reads as follows: "No attorney may file a discovery motion or a request for a bill of particulars without first conferring with opposing counsel and providing the court with a certification stating the names of all participating parties and the date, time, and place of the conference."

government is willing to provide the defense access to review the case agent transcripts. This early discovery makes the current defense request moot.

III.    <u>Carman's Failure to Justify a Court Order for Disclosure</u>

Federal law shrouds grand jury proceedings in secrecy. "Maintaining the secrecy of grand jury proceedings is a tradition in the United States that pre-dates the birth of the nation itself." *United States v. Barret*, 824 F. Supp. 2d 419, 445 (E.D.N.Y. 2018). The "indispensable secrecy of grand jury proceedings must not be broken except where there is a compelling necessity." *United States v. Procter & Gamble Co.*, 356 U.S. 677, 682 (1958) (internal quotation omitted). Moreover, this compelling necessity "must be shown with particularity." *Id.* "[T]he proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings." *In re Grand Jury Subpoena*, 103 F.3d 234, 237 (2d Cir. 1996) (quoting *Douglas Oil Co. of California v. Petrol Stops Northwest*, 441 U.S. 211 (1979)).

"Rule 6(e) implements this policy of secrecy." *Id.* But that rule also "gingerly" lifts "the veil of secrecy." *United States v. Sobotka*, 623 F.2d 764, 767 (2d Cir. 1980). Rule 6(e) severely limits a defendant's ability to obtain judicial permission to access grand jury materials. A defendant must "show[] that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii). "Grand jury proceedings are presumptively secret, and a defendant seeking the disclosure of grand jury materials bears a heavy burden." *United States v. Schlegel*, 687 Fed. Appx. 26, 30 (2d Cir. 2017). A "review of grand jury minutes should not be permitted without concrete allegations of Government misconduct." *United States v. Leung*, (2d Cir. 1994). "It is axiomatic that 'grand jury proceedings are accorded a presumption of regularity, which generally may be dispelled only upon particularized proof of irregularities in the grand jury process.'" *United States v. Basciano*,

763 F. Supp. 2d 303, 315 (E.D.N.Y. 2011) (quoting *United States v. Tranquillo*, 606 F. Supp. 2d 370, 381 (S.D.N.Y. 2009). The heavy burden placed on defendants is illustrated by the rareness of courts granting defense requests to review grand jury minutes.

Under Rule 6(e), Carman must make two distinct showings. He must present evidence about specific irregularities, and he must also show how those irregularities might result in dismissal. Carman has not and cannot make either showing.

Carman fails to acknowledge and grapple with this heavy burden. His motion relies solely on speculation. He claims without evidence that "[i]t appears that Counts On [sic] through Six of the Indictment are predicated solely upon Mr. Carman's refusal to claim responsibility for John Chatalos's death." Memo at 1-2. He raises only questions, questions that every defendant has: "It is unknown whether the grand jury was provided with adequate information regarding Mr. Carman's suspected role in John Chakalos's death, as there has never been any arrest or any adjudication of guilt." Memo at 4. Certainly, the absence of a prior arrest or conviction for allegedly illegal conduct cannot raise questions about the grand jury process.

Turning to the particularities presented in his motion, Carman raises questions about the government's presentation of evidence about the Sig Sauer that Carman purchased and later lied about. Memo at 6. The indictment alleges that Carman used that firearm, a firearm he purchased a month before the murder which fires ammunition consistent with the bullets fired at John Chakalos. The circumstances of the purchase and Carman's lies about the gun alone provide probable cause that the gun was the murder weapon, particularly when considered with other evidence pointing towards Carman's actions. To be sure, Carman can contest that proof at trial, but he has pointed to no evidence that undermines the presumed regularity of the grand jury's actions.

He also wonders whether the grand jury was told that Carman was not charged or convicted of the Chakalos murder, Memo at 7, but he fails to make any showing how such a decision would provide a basis for dismissing the indictment. The grand jury must determine probable cause based on the evidence presented. An exercise of discretion by a different prosecutor should not be presented to the grand jury, as it would be confusing and misleading without some deep inquiry into the decision-making process by that prosecutor. For example, in a firearm discharge case involving a fatality, the grand jury should not be required to understand why state prosecutors did not file murder charges as it considers charges under 18 U.S.C. § 924(j). The grand jury should make its own decision about the evidence. Additionally, Carman posits other suspects for the Chakalos murder, Memo at 7, but has not demonstrated what evidence about a particular person had to be presented to grand jury to protect Carman's rights.

Carman ignores the heavy burden he faces to obtain dismissal of charges even if he reviewed the evidence presented to the grand jury. The trial court's review of grand jury proceedings is extremely rare. A defendant cannot challenge the grand jury's probable cause finding. "An indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the charge on the merits." *Costello v. United States*, 350 U.S. 359, 363 (1956) "The grand jury gets to say—without any review, oversight, or second-guessing—whether probable cause exists to think that a person committed a crime." *Kaley v. United States*, 571 U.S. 320, 328 (2014).

As noted above, the Court should presume the regularity of the grand jury proceedings. To defeat this presumption, courts have set a demanding legal threshold, holding that a person alleging grand jury misconduct can typically only obtain relief by demonstrating misconduct of a grave nature that substantially influenced in an improper way the grand jury's decision to indict.

*Bank of Nova Scotia v. United States*, 487 U.S. 250, 259–60 (1988); *In re United States*, 441 F.3d 44, 58-59 (1st Cir. 2006). Finally, the indictment cannot be challenged based on an alleged failure to present exculpatory evidence. *United States v. Williams*, 504 U.S. 36 (1992); *United States v. Bove*, 888 F.3d 606, 611 (2d Cir. 2018).

Carman has not shown that the prosecutor committed misconduct, let alone what misconduct prejudiced him. His articulated speculations would not justify dismissal. Any failure to tell the grand jury that Carman had not been charged with murder in state court or provide descriptions of Carman's proposed alternative suspects do not amount to misconduct and cannot be viewed as substantially influencing the grand jury in an improper way.

Dated at Burlington, in the District of Vermont, this 6th day of February, 2022.

Respectfully submitted,

UNITED STATES OF AMERICA

NIKOLAS P. KEREST
United States Attorney

By:      /s/ *Paul J. Van de Graaf*
         PAUL J. VAN DE GRAAF
         NATHANAEL T. BURRIS
         Assistant United States Attorneys
         P.O. Box 570
         Burlington, VT 05402-0570
         (802) 951-6725